## LICHTENSTEIN *v.* WILENSKY.

In a suit founded on duress, for cancellation of certain contracts and conveyances and for other ancillary relief, the facts alleged and relied on to show duress were insufficient; and the judge did not err in dismissing the petition on general demurrer.

No. 2133.    APRIL 12, 1921.

Equitable petition. Before Judge Meldrim. Chatham superior court. May 30, 1920.

The exception is to a judgment sustaining a general demurrer to a petition and dismissing the action. The petition was filed January 30, 1920, by Joseph Lichtenstein against Marx Wilensky, and, so far as necessary to be stated, was as follows. In June, 1918, plaintiff and defendant, as tenants in common, owned certain improved lots in Anson and Reynolds wards in the city of Savannah, encumbered by an outstanding security deed for $55,000. They with another person, as tenants in common, also owned an improved lot in Decker ward in the city of Savannah, which was encumbered by a security deed for $50,000 and a second security deed for $15,000. Plaintiff individually owned fifteen separate stores in Savannah, conducted under the name of "Economy Grocery Company," aggregating in value $100,000. He owed individual debts as follows: to the National Bank of Savannah promissory notes aggre-

23

gating $28,250, on $18,750 of which defendant was accommodation indorser; to the Oglethorpe Savings & Trust Company, $15,000, on $7,500 of which defendant was accommodation indorser; to the Mercantile Bank & Trust Company, $10,000, on $5,000 of which defendant was indorser; to general creditors on open account $7,500. As additional security for the promissory notes to the National Bank of Savannah and the Oglethorpe Savings and Trust Company, those institutions held security deeds to plaintiff's undivided interests in all of the realty above mentioned. On June 17, 1918, the two banks last mentioned notified plaintiff that they would not renew their loans. The letter of notice issued by the president of the National Bank of Savannah stated: "You remember some time ago we requested you to retire your loans with the National Bank of Savannah. At that time, you promised to begin liquidating at an early date. The enormous demands upon us now for governmental purposes makes it necessary to call many of our loans. I must therefore call yours with the request that same be retired as they mature. As a matter of information to your guarantor, Mr. M. Wilensky, we are sending him a copy of this letter, so that he may be upon notice that the notes will have to be retired." On June 20, 1918, the defendant wrote to the plaintiff a letter saying: "From letters received by me yesterday, it appears that I am finally confronted with the necessity of liquidating papers signed by you and on which I am guarantor. Before I assume the obligation thus made and before I undertake to retire these papers, which I plan, despite numerous obstacles and the strain entailed, to accomplish within the next six months, I ask that you secure for me agreement signed by Jacob S. Collins as president of the National Bank of Savannah and Oglethorpe Savings & Trust Co., as well as yourself, setting forth that upon the retirement by me of the above-mentioned obligation (principal only, without interest) that titles to property and securities which are now being held as surety shall pass unconditionally to me. I believe this to be the surest way to avoid any possibility of misunderstanding in future between all concerned." On August 17, 1918, the defendant having paid $20,000 and assumed the balance of the debts to the two banks above mentioned, being $23,531.51, the plaintiff in consideration thereof executed a written conveyance to the defendant of all of his interest in all of the lands above mentioned. Contemporaneously with the

execution of such conveyance, the defendant executed to the plaintiff a written option for a stated time to repurchase the several parcels of land so conveyed by him, at stated prices. The writing contained the clause: "This option, being intended for the benefit of the parties hereto, shall not be negotiable and cannot be assigned or transferred by the second party herein." Before the option expired the parties entered into another written agreement dated May 2, 1919, whereby in consideration of $5,000, evidenced by sixteen promissory notes for $300 each and one note for $200, executed by defendant and payable to plaintiff successively each thirty days after delivery, and the assumption by defendant of the debt due on certain promissory notes of plaintiff to the Mercantile Bank & Trust Company, on which defendant was indorser, amounting to $3,750, the plaintiff relinquished all rights under the option, except as to the lot in Decker ward, declaring that as to such lot the option should continue under a "new agreement" dated August 17, 1918. The contract also provided that the notes from defendant to plaintiff therein referred to should bear date and be delivered at the time plaintiff "shall be ready to leave the city of Savannah with his family, to locate and engage in business at Atlanta, Ga." On June 4, 1919, plaintiff executed to defendant another paper acknowledging receipt of the notes and assumption of debts by defendant as specified in the contract dated May 2, 1919, above mentioned, and in consideration thereof declaring the option of August 17, 1918, except as to the lot in Decker ward, "cancelled and surrendered and at an end," and "that he has no further claim or demand of any kind or character" in such property, and that he "quitclaims" the same to defendant. On the paper creating the option was an entry of cancellation signed by plaintiff, dated May 3, 1919. All of the papers above referred to were executed as deeds to land are required by law to be executed, and were duly recorded. The plaintiff was the son-in-law of the defendant. In 1906 his wife became afflicted with a disease of the spine, which rendered her an invalid. Under such circumstances, he with his wife and child became inmates of defendant's home in order that his wife might have the care and comfort of her mother, plaintiff paying board for his family and part of the household expenses. They were so living at the time of plaintiff's financial embarrassments hereinabove indicated. If defendant had continued to assist him, plaintiff could

have induced the banks to forbear calling their loans and to give him time to sell out his stores to advantage and thereby save his property; but defendant, contriving to oppress plaintiff, seized upon his misfortunes and withdrew his financial assistance, with the view of wrecking plaintiff's business and absorbing his interest in all of the realty in which they were jointly interested. With such end in view, not only did he withdraw his financial assistance, but, seeing plaintiff's embarrassment, set about to coerce him by duress, for that: " In the month of June, July, and August, in the year 1918, he would, from time to time, pretend to be enraged at petitioner, and, simulating a violent temper, would enter the room where petitioner's wife was confined to her bed, and there, in an excited and enraged manner, would accuse petitioner to her of being ungrateful to him, and of imposing upon him unjust financial burdens, and would threaten petitioner's wife with separation from her mother if she did not prevail upon petitioner to have your petitioner convey to him petitioner's interest in said properties. The repeated visits of [defendant] to the room of petitioner's wife, and the scenes which would follow, would leave her in a nervous terror and dread and physical exhaustion. In addition . . [defendant] compelled her brothers and sisters to cease visiting her in her sick room, or to speak to her, and thus caused them to ostracize her, and so imposed upon petitioner and his said wife in the manner aforesaid that petitioner knew that he must choose between either submitting to the demand of the said [defendant] or allow his wife to endure such further persecution as would inflict upon her complete physical and mental exhaustion and probable speedy death. And therefore petitioner, being unable to make cash payments to his creditors, and . . unable, at that time, to sell his undivided interest in said property; . . and being unable to borrow further money on a third mortgage on his undivided interest in said properties, and hoping that the assistance which the [defendant] promised to him, through the deed to [defendant] and option to repurchase to petitioner, as heretofore recited, would enable petitioner to liquidate his business by selling off his stores, one at a time, from time to time, and thus to be able to realize quickly sufficient cash to pay up all of his creditors and repurchase his said property, . . petitioner, against his free will and solely because of the duress practiced upon him by the [defendant], ex-

ecuted to him the deed aforesaid," dated August 17, 1918. After execution of the deed and option to repurchase, dated August 17, 1918, plaintiff had opportunity to sell at large profit one of the lots included in the option; and defendant prevented the sale and took the effort of petitioner to make such sale as " another excuse to renew his visits to the room of petitioner's wife and to renew to her his charges against petitioner of ingratitude, and to renew his terrorizing and persecution of petitioner's helpless wife, as fully heretofore set out and described in . . this petition. And thereupon, in order to enable petitioner to remove his wife from the home of the [defendant], regardless of the result to her in being separated from her mother, and without regard to the result that would be attendant upon the final liquidation of petitioner's business, petitioner, under the persistent, systematic, illegal, and unjustifiable duress of the [defendant], and solely because of the same," entered into the agreement dated May 2, 1919, whereby he was forced to relinquish his option to repurchase property of a stated value greatly in excess of all that plaintiff owed defendant. Influenced solely by the conduct of defendant towards plaintiff's wife, above indicated, plaintiff " ruthlessly sacrificed his remaining property interests in Savannah " by accepting the notes recited in the agreement of May 2, 1919, and executing the quitclaim deed of June 4, 1919. All of the deeds, contracts, and papers above mentioned are void, because of duress practiced upon petitioner. Under the circumstances, defendant holds only an equitable mortgage on plaintiff's property for $52,281, with interest from August 17, 1918, which plaintiff " herewith offers to pay, . . and makes profert in court of said payment, upon condition " that defendant release to plaintiff all his claims to the property. The prayers of the petition were, for accounting for rents and profits derived from the property, for rescission and cancellation of the contracts between plaintiff and defendant, and for receiver, injunction, and general relief.

*Oliver & Oliver, Jacob Gazan* and *Brewster, Howell & Heyman,* for plaintiff.

*O'Byrne, Hartridge & Wright* and *Osborne, Lawrence & Abrahams,* for defendant.

ATKINSON, J. The right to the equitable relief is founded on alleged duress. The Civil Code, § 4255, provides: " The free assent of the parties being essential to a valid contract, duress, either of

imprisonment or by threats, or other arts, by which the free will of the party is restrained and his consent induced, will void the contract. Legal imprisonment, if not used for illegal purposes, is not duress." It is declared in § 4116 : " Duress consists in any illegal imprisonment, or legal imprisonment used for an illegal purpose, or threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." See also § 4112. The case of *Whitt* v. *Blount,* 124 *Ga.* 671 (53 S. E. 205), was a suit upon a note. The defendants filed a plea in which it was alleged, in substance : " That the defendants, the year before the notes were given, had placed plaintiff in control of their business in North Carolina, which extended also into the States of South Carolina and Virginia ; that he had a thorough knowledge and control of such business ; that he had entered into numerous contracts involving large sums of money, for the execution of work pertaining to the business ; that he had collected and had in his possession nearly $850 in money belonging to the defendants ; that he also had control of numerous writings, contracts, and other property relating to the business ; that under the circumstances no one but plaintiff could carry on the business except at great financial loss to defendants ; that the plaintiff had brought about this state of affairs in pursuance of a preconceived plan to coerce the defendants into giving him the notes ; that he was insolvent ; that he threatened to leave the employment of the defendants and take with him their money, contracts, and other property, unless they gave him the notes and paid him a certain sum of money ; and that, fearing he would carry out such threats to their great financial loss, they gave him the notes." It was held, that while the plea was not technically accurate, it was in substance a good plea of duress. In the course of the opinion, reference was made to the above sections of the Civil Code, and to the doctrine of the common law as regards duress ; and it was said that the former essentially modify the latter. Finally the decision sustaining the plea applied the doctrine that " The unlawful detention of another's goods under oppressive circumstances, or their threatened detention, will avoid a contract on the ground of duress, for the reason that in such cases there is nothing but the form of agreement, without its substance. Clark on Contracts, § 143 ; 9 Cyc. 451. Where the parties are not at arms'

length, but one of them is in a position to dictate, the courts will treat agreements which are influenced by threats of injury to or withholding of property as made under duress." The same doctrine was again applied in *Fenwick Shipping Co.* v. *Clarke,* 133 *Ga.* 43 (65 S. E. 140), where it was held: "Money extorted under duress to discharge a claim unfounded in law or fact, and known to the payee to be unfounded, may be recovered at law upon proper proceedings instituted therefor." The duress in that case consisted of the following facts: Clarke, a resident of Darien, Georgia, was in England on his way to complete an itinerary laid out for important business purposes, and which included Genoa, Marseilles, Nancy, Brussels, Antwerp, Havre, and a number of other European cities, where the traveler had engagements fixed in advance, which engagements it was important that he should keep, they being of a business character and involving interests of importance. While so in England, Esplin, an agent of Fenwick, demanded of Clarke a return of certain commissions paid at Darien by Fenwick; and upon his refusing to return the money, Esplin, in a harsh and menacing manner, threatened to attach and levy upon the baggage of Clarke. A few days later summons issued and was served upon Clarke personally, directing him to answer the suit of Fenwick eight days after service. Under these circumstances Clarke caused his Liverpool agents to pay the amount, and left several days before the summons was to be answered. In the course of the opinion it was said: "Under these circumstances a threatened seizure of the traveler's person could hardly have had a stronger coercive influence, tending to secure compliance with the unfounded claims of the shipping company, than the threatened seizure of the baggage." In *Mallory* v. *Royston Bank,* 135 *Ga.* 702 (70 S. E. 586), the question under consideration was whether certain promissory notes executed by J. G. Mallory and his son, Paul G. Mallory, were executed by them under duress. It was alleged in the plea, which was disallowed, that Paul G. Mallory had recently resigned his office as cashier of the bank; that Paul and his father were called together by officers of the bank, who knowingly and falsely stated to them that Paul Mallory had violated certain criminal laws of the State, in that, being cashier of the bank, he, in connection with another person, who was a director of the bank, had used money of the bank with which to speculate, re-

ferring to a certain store building which had been erected by them with funds largely borrowed from the bank, but which in fact had been borrowed with the full consent of the board of directors, which consent, with the approval of the loan, had been duly en-. tered on the minutes of the bank. It was also stated to them that the bonding company which had been surety upon the bond of Paul G. Mallory as cashier was liable for all of his shortcomings, and it would only be necessary to turn the defendant P. G. Mallory over to the bonding company, which would doubtless prosecute him for all the alleged felonies he had committed; and that even if by any technicality of the law he escaped a just conviction, he could never get a place in a bank again, for his record would be tarnished and his business career ruined by exposure of his many " defections." The defendants believed that the officers of the bank were telling the truth about " such laws," and that the borrowing of the bank's funds in the manner above indicated for speculation was a penal offense under the laws of the State, and they became greatly confused and alarmed; and after their fears were thus aroused, they were told by the officers of the bank that if they would sign certain notes, including the note in suit, they would not prosecute Paul G. Mallory, and, being thus induced, the defendants executed the notes. It was held that the allegations of the plea did not make out a case of duress. In the course of the opinion it was said: " The facts alleged could not form the basis of a criminal prosecution of any character, or furnish grounds for the arrest of the officer so borrowing the money, nor could they furnish grounds for aspersions against his character, nor does it appear how it could put him in bad odor with the bonding company. The defendants were men of experience, dealing at arms' length with the officers of the bank, were charged with notice of the law, bound to know that it was no violation of law or other duty for them to borrow money under the circumstances enumerated; and could not ascribe their act in executing the note to a constrained consent or to fraud or duress in a legal sense. . . The allegations . . present an example of pure threat without any color of power or authority to make it effective." On the general subject see: *Russell* v. *McCarty,* 45 *Ga.* 197; *Bond* v. *Kidd,* 122 *Ga.* 812 (50 S. E. 934); *Dorsey* v. *Bryans,* 143 *Ga.* 186 (84 S. E. 467, Ann. Cas. 1917A, 172); *Williams* v. *Stewart,* 115 *Ga.* 864 (42 S.

E. 256); *Strange* v. *Franklin,* 126 *Ga.* 715, 717 (55 S. E. 943); *Hoke* v. *Atlanta,* 107 *Ga.* 416 (33 S. E. 412), and cit.; *Hickman* v. *Cornwell,* 145 *Ga.* 368 (89 S. E. 330); 9 C. J. 1180; 13 C. J. 396. According to the allegations of fact (as distinguished from mere conclusions of the pleader) relied on to show duress, the plaintiff and the defendant were men of broad business experience and capable of managing their own affairs. Their business and other relations did not demand that defendant continue rendering financial aid to the plaintiff, or prevent him from seeking reimbursement for liabilities that he had incurred on plaintiff's account. He had a legal right to proceed in the manner and under the circumstances alleged, and the fact that he exercised such right did not amount to duress within the meaning of the statute. The alleged misconduct of the defendant did not amount to restraint of the person or property of the plaintiff or of injury or threatened injury to the person, property, or wife of the plaintiff, which the latter could not avoid. The plaintiff and his wife were voluntary inmates of defendant's home, and in no sense was either of them restrained from leaving when they should desire. Under the circumstances it was in the power of the plaintiff to shield his wife from annoyance by the defendant, without being driven to the necessity of executing the papers. Taking the petition in its entirety, the allegations show that the plaintiff, in executing the papers, acted with due deliberation and without improper coercion upon the part of the defendant. A case of duress was not alleged; and the judge did not err in dismissing the petition on general demurrer.            *Judgment affirmed. All the Justices concur.*